UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAY 0 7 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| LEONEL LOPEZ AND | § | |
| ELIA C. LOPEZ, | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-03-209 |
| | § | |
| MEL MARTINEZ, SECRETARY OF HOUSING | § | |
| AND URBAN DEVELOPMENT | § | |
| Defendant. | § | |

## PLAINTIFFS' RESPONSE TO PENDING MOTIONS FOR
## SUMMARY JUDGMENT AND TO DISMISS

### BACKGROUND FACTS

In 2003 Plaintiffs learned that a HUD project called Lasby Park Terrace, located in San Benito, Texas, was to be sold at public auction and Plaintiffs thereafter began the rather weighty process of qualifying to bid on the said property. Such process involved obtaining a pre-sale financing commitment from a bank, which itself involved appraisal and survey requirements, extensive financial projections, repair estimates, an engineering review, and, finally, the deposit of $50,000.00 with HUD. In terms of out-of-pocket expenses, including lost interest, to date Plaintiffs have spent in excess of $20,000.00 in trying to obtain the property in question. Plaintiff Elia Lopez, who in addition to being an attorney is also a CPA, expended extensive accounting time in the financial projection component of the bid process. The value of such accounting efforts constituted a significant, additional, expense for Plaintiffs.

After HUD officials had cancelled several announced auction dates, an auction of the property finally was consummated in September, 2003 not on June 25, 2003 as stated in Defendant's Summary Judgment Motion). Prior to the end of the said September 2003 auction no disclosures had

been made by HUD to any member of the public including bidders, about chronic flooding and sewage problems which it was post-auction learned affected the area.

Because of the generally poor condition of the property, the majority of bids made at the auction were less than $100,000.00. Plaintiffs' bid of $105,000.00 would have been the high bid except for later bids tendered by an out-of-state buyer who had arrived at the auction late and over the protests of some bidders including Plaintiffs, was allowed to bid. Having arrived late such bidder did not hear the lengthy, cautionary announcement made by the HUD auctioneer. Further, as the HUD auctioneer was in the process of ending the bidding process at Plaintiffs' bid of $105,000.00, such official, rather than following the time-honored auction routine of "going once, going twice, sold" instead paused the auction while the late-arriving bidder conducted a long cell phone conversation with an unknown third party. Allowing one bidder the special privilege of delaying a bid would clearly have given such bidder advantage over other bidders who had to make quick decisions without a think-tank backup. As a result of such bid delay, such late-arriving bidder was able to make an carefully analyzed additional bid, and then after a series of bids between such bidder and Plaintiffs, Plaintiffs' bid of $451,000.00 ultimately became the final high bid. At such point of time Plaintiffs had pre-approved financing which was based upon, in part, financial projections tied to current occupancy. Plaintiffs had also agreed to pledge two unencumbered business properties as additional collateral for their purchase money loan.

A few days after the auction an item appeared in a local newspaper which revealed for the first time that the property was subject to chronic flooding.

Immediately after the auction, Plaintiffs complained directly to HUD and also to Congressman Solomon Ortiz about the conduct of the auction. Plaintiffs had several conversations

with senior HUD officials immediately after the auction and were specifically told that there would

be absolutely no problem in extending the closing date of Plaintiffs' purchase and of waiving any

fees otherwise payable for closing extensions. A senior HUD official specifically represented to

Plaintiff that such extensions and waivers were routinely granted and that few closings of HUD

auctions in fact ever took place within the written time limits established in bid packages. Plaintiffs,

within three days of the closing deadline and after being assured there was no problem with an

extension, had their lender send a standard letter of loan commitment which was in addition to a pre-

sale credit approval letter.

Thereafter, and most unexpectedly,  on or about November 4, 2003, Plaintiffs received a

HUD letter rejecting Plaintiffs' purchase because of allegedly unacceptable financing. Such letter

unwittingly confirmed precisely what Plaintiffs had been earlier told by HUD officials, namely that

representations had been made to Plaintiffs about there being no problem with extending closing and

about not having to pay closing extension fees. Rather than such letter containing a confirmation of

an extension to close and waiver of extension fees, the letter instead "apologized" for HUD's

misleading of Plaintiffs about such matters and promised to refund Plaintiffs' $50,000.00 auction

deposit.

Sometime after receiving the letter of "apology", Plaintiffs learned that HUD had, ex-parte,

and for no legitimate reason, contacted Plaintiffs' bank to (1) inform the bank that Plaintiffs were

no longer "qualified buyers", and  (2) gratuitously inform the bank that the HUD project in question

had an asbestos problem. The clear intent of such action by HUD was to make it impossible for

Plaintiffs to ever close any loan involving the property.

Subsequently and independently, Plaintiffs discovered that the second highest (the "late-

3

arriving") bidder had been offered the property as second highest bidder but had declined to purchase the property. Under HUD sale terms the second highest bidder can purchase auctioned property when the highest bid der is rejected by HUD. Plaintiffs also learned that another auction of the property was planned, apparently necessitated because the aforementioned second highest bidder had backed out, and, in response to learning of a new planned auction, Plaintiffs filed the instant lawsuit. The immediate filing of such lawsuit was necessary as a prerequisite to the recording of a *lis pendens* which was itself necessary to protect Plaintiffs' interest in the property in question. While some states and many nations permit the filing of what are known as "caveats" in land titles offices and which protect asserted real property interests without litigation, Texas uses the *lis pendens* system which requires the actual existence of litigation and which litigation must be specifically referenced in the lis pendens document filed. The only other alternative available to protect Plaintiffs' rights, a temporary injunction, would also have required litigation. Because of the cost factor, the temporary injunctive approach was not utilized.

After the litigation had been initiated, the parties agreed to mediate with the Hon. Israel Ramon serving as mediator. Following several hours of negotiation HUD indicated that while it might be legally possibly to resolve the dispute by deeming that Plaintiffs' $105,000.00 bid, being the third highest bid, and being the highest *outstanding* bid after the second highest bidder refused its right to purchase, that input would be required from senior HUD officials not present and not, at that late hour in Washington, available via telephone. The bid package language spoke about "bidders" as opposed to "bids" and had no express reference to the situation at hand. A further possible solution, namely confirming Plaintiffs highest bid and then offsetting damages accruing *after* the sale (physical deterioration in the property and reduced value due to reduced occupancy),

4

in order to arrive a fair net sale price, was also discussed as such approach would eliminate the legal question of whether Plaintiffs' $105,000.00 "third" bid could properly be deemed the operative bid in light of the rejection/abandonment of the two highest bids.

To aid in the possible utilization of the second suggested legal solution, HUD requested that after the mediation adjourned, that Plaintiffs provide evidence that the property had declined in value since the rejection of Plaintiffs' bid. In reliance on such HUD statements, Plaintiffs hired a civil engineer to assess the deterioration which had taken place since the auction. One of the damage/deterioration issues was a so-called sink hole which constituted, and currently constitutes, a significant danger to tenants and their children. Plaintiffs also undertook an analysis of the decline in property value as would be evidenced in the significant occupancy decline which had been revealed by HUD in the mediation. In the first week of May 2004, a substantial newspaper article once again appeared in a local newspaper and which confirmed the significant deterioration which had taken place since the auction and the poor management of the property by its prior owner.

While Plaintiffs were incurring additional expenses to satisfy HUD's mediation request, and awaiting a HUD headquarters response on the legal question of the efficacy of Plaintiffs "third bid," HUD verbally requested that Plaintiffs consent to the filing of a joint motion for continuance. In light of the aforementioned mediation events, Plaintiffs felt that such continuance would be appropriate. Thereafter, however, Plaintiffs received a faxed proposed joint continuance motion from HUD's legal counsel which contained the statement *that mediation had been unsuccessful.* Such statement was only less shocking than might otherwise have been the case because Plaintiffs had already become somewhat accustomed to HUD's conduct.

It would only seem reasonable to conclude that HUD has acted in an arbitrary, capricious

manner in this matter, most probably because Plaintiffs had the temerity to exercise their First Amendment right to petition government. Undoubtedly when HUD officials received the call from Congressman Solomon Ortiz's office to inquire into the conduct of the auction, someone in HUD's Texas administrative offices apparently thought that Plaintiffs' First Amendment rights ought not to have been exercised. Of considerable significance in reaching such a conclusion is the fact that *the reserve price set was $45,000.00*, which is to say that HUD was willing to sell the property for that sum of money. Who, other than for vindictive reasons, would decline a sale of a property to a highly desirable buyer for $451,000.00, a property HUD was willing to sell for $45,000.00 ? If one reads the history of the Federal Housing Act, one would think that the agency was established - and that HUD's mission in its life - was to provide good housing for the poor. The tenants in Lasby Park, if what they have said and what has been reported in the media recently, is at all accurate, have been living in a HUD sanctioned slum for several years. Refusing to sell such property to someone who is an extremely well-educated individual, with housing experience, whose role in the community as an elected judge demands responsible conduct, for more than ten times the reserve price can hardly be explained in any manner other than unreasonable, capricious, and vindictive.

## INTRODUCTION

The issues raised by Defendant in its motions are somewhat intertwined. Because it would appear that in the worst case scenario that the United States Court of Claims would have jurisdiction over at least some of Plaintiffs' claims, whether exclusive or otherwise, and whereas jurisdiction would be ultimately irrelevant if HUD is immune from suit, the immunity issue is dealt with first.

1-    **FEDERAL "SOVEREIGN" IMMUNITY**

### THE ACCOUNTABILITY OF FEDERAL GOVERNMENT

Nearly one thousand years ago Geoffrey Chaucer, in his epic work known to us as "Canterbury Tales" wrote of the pilgrim cleric "If gold shall rust then what of iron." One would, in the 21st century, like to similarly hope that our federal government, above all else, can be trusted to exhibit the highest standard of conduct because if that is not so what can we expect of other lesser elements of society. Sadly, Defendant HUD's conduct in this case conjures up images not of impeccable moral conduct but instead images of bad faith by those whose salaries we as taxpayers all pay and by those we all have a right to expect to act in a fair manner.

Considering that the American Revolution was fought to end the tyranny of monarchy, and considering the express prohibition in our *Constitution* against the conferring of titles of nobility (Article 1, Section 8-8), it is indeed troubling that there is such a thing as federal "sovereign" immunity at all (and attempts to employ more politically correct terminology such as "official" or "government" immunity cannot obscure the royal origin of the concept). The notion that the king (the "sovereign") can do no wrong was grounded in the notion of divine right whereas clearly power is wielded in this nation by the will of the people and not the will of a king empowered by God. Our federal government has the most power to do the most wrong to the greatest number of people. That reality could not have escaped the founders of this nation , did not escape them, and should not escape any of us today.

While members of the United States Supreme Court have often used the phrase that "it is too late in the day to argue that . . . " to justify acceptance of what has been decided before, the *Dredd Scott* case (60 U.S. 393 - 1856) and the *Slaughterhouse Cases* (163 U.S. 537 - 1886) fortunately

teach us otherwise. It is never to late in the day to correctly interpret the *Constitution*. Those wronged by the acts of federal government should be no more at peace with the doctrine of sovereign immunity than were Afro-Americans with the notion of separate but equal.

In one of the great ironies of the recent past century, Congress relentlessly grilled Supreme Court candidates on civil rights, criminal rights, and abortion but neglected to ask questions on how such candidates felt about *Gibbons v. Ogden* (6 L. Ed. 23 - 1824). As a result we now have a Supreme Court that for the first time in a century and a half reads the division of powers between Washington and the states more favorably for the states, that is, views Congressional power as more limited. Federal preemption is clearly no longer a given nor is the overall notion of an unfettered federal giant. This new reality was first seen in the school gun case, *United States v. Lopez* (514 U.S. 549 - 1995) which invalidated federal attempts to control possession of guns near schools.

One can reasonably surmise, in light of the First Amendment's text hose right of petition is a weighty argument against sovereign immunity, that even casual observers from other nations must be confused by the existence of *any* level of federal *sovereign* immunity in the United States. So too, the necessity of a contemporary attempt by some to enjoin the use of phrases like "In God We Trust" (explained away as "patriotic" or "ceremonial" in *O'Hair v. Blumenthal, et al.*, 462 F. Supp. 19, W.D. Texas, 1978) in government proceedings must seem similarly curious to the foreign observer since the First Amendment seems pretty clear textually. For those who lament at the vitality enjoyed by the doctrine of federal sovereign immunity, perhaps there is a ray of hope which emanates from the Supreme Court's current willingness to review those religious invocations that we are all so accustomed to employing.

A fair reading of the relevant court decisions in the area of federal sovereign immunity,

fortunately, however, reveals that the very expansive reading given to federal sovereign immunity is largely found in the briefs of the federal government agencies who dutifully respond to lawsuits seeking to redress government wrongs by asserting that federal sovereign immunity (which is also not textually present in our *Constitution*) is somehow a concept superior to even the *Constitution*. The court decisions, fortunately, reflect an apparently considerably narrower view of "sovereign immunity." The increasing and frequent use in court decisions of the more "politically correct" terms such as "government immunity" is in itself instructional since it evidences a certain level of intellectual discomfort which must surely frequent the minds of those who would assert that federal government in the United States is immune to suit just as was King George 5th.

As Defendant itself notes in its motions, even Congress has been somewhat self-conscious about exercising royal power, waiving its claimed sovereign immunity via a plethora of federal legislative provisions which would apply to this cases depending on the facts proved up. The FTCA, the Tucker Act, and the National Housing Act of 1937 ("NHA"), 12 U.S.C. § 1701, all expressly waive sovereign immunity. To that list Plaintiffs would append equitable relief under 28 U.S.C. §1361.

**2-    JURISDICTION**

The baseline for jurisdictional questions involving claims involving federal rights is the principle that the United States must persuasively show that Congress intended to deny litigants a judicial forum. See, generally, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967).

**The Administrative Procedures Act**

Defendant apparently acknowledges that in this case there can potentially be federal district court jurisdiction under The Administrative Procedures Review Act, 5 U.S.C. §702 to test the arbitrariness of the cancellation of the sale to Plaintiffs. Defendant apparently acknowledges that the APA, the Federal Tort Claims Act, and the Tucker Act are each at least partial waivers of federal sovereign immunity.

Under relevant APA cases, it is not at all obvious here that there is an adequate remedy available outside of the APA since *collateral* money damages (which might be available in the Court of Claims) are not normally viewed as precluding extraordinary remedies such as are sought by Plaintiffs and which are usually, on equitable principles, available with respect to land transactions (because land is inherently unique). Further, Plaintiffs are unaware of any statute which expressly or impliedly prohibits application of the APA to Plaintiffs' case facts. Finally, while it may be that some of Plaintiffs' claims are properly viewed as purely contractual and would therefore be within the Tucker Act (which confers jurisdiction on contract claims over $10,000.00 upon the Court of Claims), *Lulac East Park Place V. HUD*, 32 F. Supp. Ed 418 (W.D. Tex. 1998) (cited by Defendant) clearly stands for the proposition that a federal district court has, in appropriate circumstances, jurisdiction to hear non-contractual claims such as Plaintiffs' constitutional and APA claims. In *Lulac* the court observed that "even where a case is contractual in nature, the presence of issues requiring the interpretation of federal law and regulation give rise to a federal question" (citing Katz v. Cisneros, 16 F. 3d 1204, 1207 -Fed. Cir.-1994). In *Knox Hill Tenant Council v. Washington* (United States Court of Appeals for the District of Columbia, 448 F. 2d 1045 -1971) the court sustained jurisdiction in HUD case where tenants sought APA relief to have a district court

enforce tenant contracts. The court noted the breadth of 5 U.S.C. § 702 which provides that "A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof."

As high bidder, Plaintiffs had a clear, vested property interest in the purchase of the said property. Having deposited $50,000.00 and having subsequently invested more than $20,000.00 in the sale process, and having expended significant professional and other time in purchasing the Lasby Park HUD project, Plaintiffs had a significant property interest under any view of the Fifth Amendment's due process/taking guarantees. See *Chancellor Manor et al v. United States*, 331 F. 3d 891 (United States Court of Appeals For the Federal Circuit -2003) where the contractual rights of HUD multifamily projects owners were deemed property rights within the Fifth Amendment's protection against taking without just compensation.

Plaintiffs would also assert that under the decision rendered in *Deterding v. United States*, 107 Ct. Cl. 656, 661; 69 F. Supp. 214, 216 (1947), where the court of claims recognized that a land transfer agreement was a contractual matter within the meaning of 28 U.S.C. §1491(a), that this court would have jurisdiction over Plaintiffs' land ownership claims and the power, under 28 U.S.C. §1361, to grant equitable relief. There can be no doubt that there was a contract to purchase land from the United States regardless of what those contractual terms might be argued to be. Certainly the fact that all bidders, including Plaintiffs, deposited $50,000.00 with HUD is significant evidence of a serious intent to create a binding, weighty relationship and therefore is strong evidence of vested property rights thereunder. Moreover, the parties had a formal, written agreement. This is not the case where a party's status was vague and insubstantial.

In *Cape Fox Corp. V. United States* (CA9 Alaska- 1981) 646 F2d 399, the court recognized a district court's jurisdiction to hear equitable relief claims in circumstances where there were

11

allegations of deterioration of timber assets involving the federal government. Plaintiffs allege that they have purchased a property from the United States which is also deteriorating. Not only is the property in question physically deteriorating, there is a significant decline in occupancy which is a major element of overall value.

### General Equitable Relief

In *Marbury v. Madison* (2 L. Ed. 60, 1803), most often referenced as the birthplace of judicial review (which although debated by the founders has no textual basis in the *Constitution*), the United States Supreme Court, it will be recalled, did not say that mandamus not a proper federal remedy to issue against the president, just that the Supreme Court had no *original* jurisdiction to do, holding Congress' 1789 Judiciary Act purporting to give that court such power to have been unconstitutional. It will be remembered that *Marbury* was prominently cited in *United States v. Nixon* (418 U.S. 683, 1974).

Often "ministerial" versus "discretionary" distinctions are made in trying to formulate and refine a doctrine of federal sovereign immunity. In *Houston v. Ormes*, 252 U.S. 469 (1920), the United States Supreme Court, citing multiple prior Supreme Court decisions, determined that equitable remedies would be available to compel the payment of attorneys fees to a taxpayer from the U.S. Treasury, observing that ministerial, as opposed to discretionary governmental acts, did not raise a sovereign immunity bar. HUD's conduct here is clearly ministerial.

28 U.S.C. §1361 specifically grants to United States district courts the jurisdiction to issue writs of mandamus "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Plaintiffs have plead for general equitable relief and clearly

have factually alleged that HUD has a contractual duty owed to Plaintiffs. Equitable writs are admittedly not ones which are to be issued indiscriminately against any entity, let alone against government, but such relief is appropriate where a clear ministerial duty is present. See, generally, *Smith v. Grimm* (534 F.2d 23, 25 -9[th] Cir., 1976).

In this instant case HUD had a clear duty to grant an extension to Plaintiffs without cost because that is precisely what HUD had promised. The extension needed was only three days. See affidavit of Elia Lopez (Exhibit "A") The allegation of the existence of such promise would constitute a material fact question. Exhibit "B" is a clear admission by HUD that it had represented to Plaintiffs that they would be granted an extension without charge. The representation in Defendant's motion that Plaintiffs could not afford to pay extension fees or simply elected not to pay is untrue. Plaintiff's objective in obtaining the extension was to obtain a short period of time to finalize financing details. Having deposited $50,000.00 with HUD, having invested some $20,000.00 in the sale process, and having committed to spend $1.2 million within one year on improvements, the suggestion by Defendant that Plaintiffs could not afford the total of some $6,000.00 otherwise needed for a three day extension, is simply not credible.

**The Court's Jurisdiction to Hear Tort Claims**

Plaintiffs specifically allege negligence in their complaint. Clearly that allegation invoked the Federal Tort Claims Act and the court's derivative jurisdiction to hear this part of Plaintiffs' claim. Because the primary nature of Plaintiffs' suit was to protect Plaintiffs' property interest in real estate (the property had been re-posted for sale and was deteriorating), it was necessary to file an immediate lawsuit and clearly it would be in the interests of judicial economy that only one lawsuit

address all of Plaintiffs' claims. Defendant complains about a lack of administrative exhaustion.

First, because this instant lawsuit is not directly against the United States, there is some question of whether or not 28 U.S.C. §2675(a) and 28 U.S.C. §2401(b) requiring administrative claims to be filed, even apply. The statute textually requires exhaustion only against the United States (who in normal circumstances is typically later substituted in for agent/employee defendants upon certification concerning the governmental role played by the named employee-defendant).

Assuming for the purposes of argument that Plaintiffs were obligated to file an administrative claim and have not, it is to be noted that the major Congressional justification for requiring presentment of claims administratively was to avoid the cost of litigation having to be borne by government when that cost might be avoided through an informal settlement procedure. Since, however, actual litigation was necessary here to perfect a *lis pendens* and to obtain equitable relief (under the FTCA a federal agency has six months to resolve a claim), the administrative process could not eliminate litigation here. To the extent that an administrative FTCA claim would otherwise have been required, however, dismissal of Plaintiffs' FTCA claims on a jurisdictional basis, assuming Plaintiffs' success on equitable claims,  will inevitably result in subsequent FTCA litigation in federal district court.  Assuming that administrative exhaustion is even required, a reasonable, judicially economical  resolution would be to permit Plaintiffs to proceed in this litigation on their FTCA claims now, particularly when according to Defendant's statement that mediation of this case has failed, such failure at least arguably constituting a rejection of Plaintiffs' FTCA claims. Generally speaking, hyper-technical interpretation of administrative claims procedures is not required. See *Adams v. United States,* 615 F.2d 284, clarified 622 F. 2d 197 (5th Cir. 1980) and *Broudy v. United States*, 722 F.2d 566 (9th Cir. 1983).

## 3-    FAILURE TO STATE A CLAIM

Defendant principally complains that Plaintiffs' complaint does not provide sufficient detail, *e.g.*, with respect to due process allegations. Clearly the complaint does so and in a fashion fully consistent with federal liberal pleading rules. As Professor Wright has written "The draftsmen of the Civil Rules proceeded on the conviction, based on experience at common law and under the codes, that pleadings are not of great importance in a lawsuit." (Law of Federal Courts, 2d,p. 273 West Publishing, Minneapolis, Minnesota) See, generally, *O'Donnell v. Elgin*, J. E. Ry. Co., 338 U.S. 384 (1949). If Defendant is unclear, which is doubtful, as to precisely what the facts of due process alleged are, then a motion for a more definite statement is the appropriate tool.

What Congress apparently intended when adopting the liberal federal pleading standard (which was designed, in part, to avoid the harshness of the English "writ system") was to avoid fifty page complaints. As shown by the affidavit of Plaintiff Elia Lopez, Plaintiffs invested thousands of dollars in purchasing the property, tendered proper financing, and were also told by senior Texas HUD officials that they could have an extension, without paying any fee, same stated to be the rule rather than the exception in HUD auction sales. As noted, the primary issue for Plaintiffs in wanting an extension was finalize financing but it was also in part to have time to resolve Plaintiffs' complaints about the way the auction was conducted. Plaintiffs had financing pre-approved before the sale and had a further, timely, post-sale loan commitment. Plaintiffs, in any case, do not concede, in any fashion, that their financing did not meet contractual requirements.

It is patently obvious that due process property interest standards are robustly satisfied by the facts of this case.

The suggestion that HUD does not have the authority to, in effect, make any oral

15

representations, is specious. If HUD's position were correct then all of the delayed closings which senior HUD officials acknowledged to have been the rule rather than the exception, would mean that all of those late-closing sales are void and that any interested party could now have them set aside.

Item 5 of the bid package, instructively, expressly allows HUD to "waive any informality in any bid received" and Item 10 invites bidders needing additional information to "please call the contact person . . . " Presumably such contact would be to obtain oral information to be relied upon, not discarded. Instructively, Attachment "B" to the bid package specifically acknowledges that:

"Extensions of time to close the sale are within HUD's sole and absolute discretion."

Given the clear written power, acknowledged in the above clause, to do what HUD now says it could not do, namely to grant extensions, it seems somewhat remarkable, particularly in light of the HUD letter written to Plaintiffs acknowledging that representations concerning an extension *had actually been made to Plaintiffs*, that now HUD says it had no power to grant extensions. The above written clause clearly confirms the broad power HUD officials acknowledged having used more often than not in closing multifamily project sales, the same power necessary in granting the extension to Plaintiffs. Finally, if no agent of HUD had any authority to make any oral representation then the auctioneer's verbal acceptance of the highest bid would be worthless. The very first page of the auction materials announces that "bids will be accepted orally . . . " Further, Section 2, paragraph 6 provides that the auctioneer, at the close of the auction is to provide "**VERBAL NOTIFICATION TO THE HIGH AND SECOND HIGH BIDDER**". The gist of Defendant's position therefore appears that the spoken word is final and acceptable if HUD's interests are served.

**28 U.S.C. § 1331**

Clearly this case is replete with substantial federal questions, to wit, the First and Fifth Amendments, the Federal Tort Claims Act, and the National Housing Act, 12 U.S.C. §1331. The case of *Ames-Ennis, Inc. V. Midlothian, Ltd.* (496 F. Supp. 939 - 5th Cir., 1979) which is cited by Defendant as recognizing  the test of whether a case arises under 28 U.S.C. § 1331, holds that a federal law must "really" and "substantially" be involved in order to fall under 28 U.S.C. § 1331. Certainly Plaintiffs' case would satisfy such test. However, in light of the fact that the Defendant is an agency of the United States government, application of the test seems unnecessary.


**28 U.S.C. § 2410**

The factual basis of this litigation is that an auction sale was conducted by an agency of the United States government to foreclose on "a mortgage or other lien" against a private third party. Plaintiffs claim that because Plaintiffs are entitled to ownership of the real property in question, that HUD, an agency of the United States, now has no valid lien or claim in this property.  Because of the many bases for federal jurisdiction evident in this case, an application of this statute is not overly significant in this case.


**4-    THE TUCKER ACT**

Essentially the Tucker Act, 28 U.S.C. § 1491 provides exclusive jurisdiction in the United States Court Of Claims for contractual claims asserted against the United States where the claimed amount of damages exceed $10,000.00. The problem with Defendant's argument here is that an equivalent jurisdiction is given to federal district courts with respect to FTCA claims and this instant

case involves both tort and contract claims as well as claims for equitable relief. In light of no express power conferred upon the Court of Claims to grant equitable relief, and the existence of and nature of such court being antithetical to non-monetary relief, the issue of where the case should properly be heard is far from clear. If Plaintiffs are entitled to equitable relief (against the Secretary of HUD) which would result in the conveying of the property to Plaintiffs, then there may well be no contract claim which exceeds $10,000.00. In this mixed type of case, given that most witnesses reside in the Rio Grande Valley and the balance in Fort Worth, with no witness in Washington, it would clearly make economic sense to try this case in Texas and not in the Court of Claims. In *Cuyahoga Metropolitan Housing Authority v. United States* (57 Fed. Cl. 751 -2003), that court, in addressing similar contract issues where Section 8 owners successfully sought to compel HUD to honor its contracts, the court likened HUD's attitude to the Roman god Janus "often portrayed having two faces - one looking forward, the other backward. A similar profile is often exhibited by the United States in contracts effecting government programs - like Janus it displays the visages of both of an ordinary contracting party and the sovereign. The former eagerly looks forward to the societal benefits often only derivable through the cooperation of its contracting partners, while the latter charily views its contract obligations backwards through the prism of uniquely enjoyed sovereign defenses."

If, however, this court were to determine that the better court to hear this case is the Court of Claims then transfer and not dismissal is appropriate. See *Wood v. United States* (961 F. 2d 195-Fed Cir., 1992).

**5-    AGENCY/AUTHORITY/ REPRESENTATION ISSUES**

Defendant, in essence, argues that government employees first are not obligated to make any disclosures about known defects in property the United States Government sells, and, second, that anything government employees say orally cannot bind the government unless there is an actual authority (versus apparent or ostensible) authority to do so.

The written documents in question have an overriding message: HUD officials are given an discretion over Auction sales. In bid package Attachment "A", paragraph 8 there is no requirement *that an extension* must be in writing. For that reason, it would be manifestly illogical that the verbal HUD acts which we have seen permeate the sale process somehow by-pass such paragraph. Because HUD's own documents adequately demonstrate actual authority to control any aspect of the auction, the issues of apparently or ostensible authority need not be addressed. Were the facts such that there was a claim that no HUD official could make any oral promise or representation because that would violate the *Constitution* or HUD's enabling act, then that would be a different question. Plaintiffs, however, simply allege that HUD exercised the powers it asserts it has.

**6-    PREEMPTION**

Defendant cites no United States Supreme Court or 5th Circuit opinion holding that the FTCA or Multifamily Mortgage Act preempt state causes of action. As noted earlier, the current pro-state attitude of the United States Supreme Court suggests that preemption is disfavored (which was earlier evidenced in cases denying preemption arguments in the area of state antitrust legislation). In a case styled *Rio Grande Underwriters, Inc. v. Pitts Farms,* Inc., (USDC, Southern District, Brownsville Div., Cause No. 01-CV-22, affirmed on appeal 276 F3d 683- 5th Cir. 2001 ) the court

determined that the Federal Crop Insurance Act, 7 U.S.C. § 1501, did not preempt state causes of action such as the DTPA. The Fifth Circuit made its decision notwithstanding some other circuit court decisions to the contrary.

### 7-    "AS IS" DISCLAIMERS

Defendant argues that with respect to any representations which might be false or misleading (which Plaintiffs posit to include non-disclosure as well), that the language of the bid materials, with their multiple disclaimers, insulated HUD from liability for what might otherwise be actionable misrepresentations. The problem with that argument is that there were at least thirteen pages and an architect's property study given to bidders making hundreds of representations about the property. No number of purported disclaimers can explain away the real intent of those materials which notwithstanding protestations to the contrary, are inherently attempts to market the property. If property really is being sold without representations, then why are there extensive written representations? If a property is alleged to be marketed by a seller without representations, i.e., "as is" then one would expect there to have been no representations made at all. Essentially HUD argues, in effect, that it can make representations which obviously benefit HUD, re-label such representations as "information" and then bury them in a heap of disclaimers, thereby to escape the consequences for those representations. HUD would apparently view its own representations much as Thomas Hardy's farm child, who, taken to the London Zoo for the first time, and upon seeing a giraffe for the first time exclaimed : "There ain't no such animal". Notwithstanding HUD's copious written disclaimers, HUD made representations to bidders and clearly did so with the intent to encourage people to bid on the property.

### SUMMARY JUDGMENT/MOTION TO DISMISS CONSEQUENCES

Only where it can be demonstrated that a party could not ever plead facts precluding a dismissal of a case, should a case be dismissed. Parties, under the liberal federal rules, should be given adequate opportunity to plead a viable case. Generally, see *Rossiter v. Vogel* (134 F. 2d 376 - 2nd Cir., 1943), *Retail Clerks International Ass'n v. Lion Dry Goods, Inc.* (341 F. 2d 715, 6th Cir. - 1965, cert. denied 382 U.S. 839) and *Foman v. Davis* 371 U.S. 178, 182 (1962).

### SUMMARY

There are multiple bases of district court jurisdiction in this case. 28 U.S.C. § 1346 grants district courts exclusive jurisdiction over negligence claims brought against the United States. There is, admittedly, some question of whether this case more properly belongs in the United States Court of Claims, however, the most reasonable place to hear the case is in this court because the land in question is located here and all the parties and witnesses are located in the State of Texas.

Plaintiffs challenge the constitutionality of sovereign immunity, but in any case there are multiple waivers of that doctrine in the federal statutes involved in this case.

This is not a case where a plaintiff seeks to infer a contract from acts or statements. There is a written contract which contains a clause allowing waiver of certain terms. There may be a factual dispute as to the existence of a waiver, however, the submitted HUD letter appears to be a clear admission that a waiver relative to the closing date was in fact granted.

Respectfully submitted,

_____
DENIS A. DOWNEY
State Bar No. 06085500
Federal No. 1186
1185 F.M. 802, Suite 3
Brownsville, Texas 78526
956-544-0561 / 956-544-0562 (FAX)

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent this 7th day of May, 2004, via the U.S. Mail, first class, postage prepaid, to the following:

Steven T. Schammel
Assistant U.S. Attorney
U.S. Department of Justice, Southern District of Texas
1701 West Highway 83, Suite 600
Bentsen Tower
McAllen, Texas 78501

_____
DENIS A. DOWNEY

22

STATE OF TEXAS                    }

COUNTY OF CAMERON      }

### AFFIDAVIT OF ELIA C. LOPEZ

1-    My name is Elia C. Lopez and I am over the age of eighteen years and qualified to make this affidavit.

2-    The facts set out herein are within my personal knowledge and are true and correct.

3-    My husband Leonel Lopez and I are the Plaintiffs in this cause of action. The HUD letters attached to our response to pending motions filed by Defendant are true and accurate copies of correspondence sent to me by HUD.

4-    The HUD official conducting the auction of Lasby Park Terrace Apartments stated that the reserve auction price was $45,000.00.

5-    Because of what we perceived to have been improprieties in the conduct of the auction, we protested to senior Texas HUD officials and also lodged a complaint with Solomon Ortiz who is our local congressman.

6-    On several occasions I was specifically told by senior Texas HUD officials that there would be no problem with granting us an extension, without cost, to finalize our financing. I was assured that such extensions were an historically  common HUD practice. Based on those representations I submitted financing documents approximately three days after the written deadline.

7-    After being told by HUD that the sale contract would not be honored notwithstanding the representations made by HUD to me, I discovered that the property was being re-posted for auction. I responded by filing this lawsuit and a *lis pendens*. I also subsequently learned that the second highest bidder had declined to purchase the property.

8-    I have monitored the property condition since the sale and its condition, which was deplorable at the time of the sale, has deteriorated even further.

9-    I and my husband invested thousands of dollars in preparing for the auction and in post-auction expenses necessary to close. We would have had absolutely no difficulty paying any extension fees had we been required to pay same.

10-    After learning that HUD would not honor our contract, I discovered that HUD officials, after giving us formal notice of that dishonor, gratuitously contacted my lender, a local bank, and informed such bank that not only was I no longer a "qualified buyer" but also added that the property had allegedly had asbestos.

EXHIBIT
A

FURTHER AFFIANT SAYETH NAUGHT



_____
Elia C. Lopez, Affiant


SUBSCRIBED AND SWORN TO before me the undersigned notary, this the 7th day of May 2004 by Elia C. Lopez.

JANIE URENA
Notary Public
of Texas
My Commission Expires
January 24, 2005

_____
NOTARY PUBLIC, STATE OF TEXAS



**U.S. Department of Housing and Urban Development**
Fort Worth Regional Office, Region VI
Fort Worth Multifamily PD Center
801 Cherry Street, PO Box 2905
Fort Worth, TX 76113-2905
www.hud.gov

NOV 0 4 2003

Mrs. Elia Cornejo Lopez
235 Sunset Drive
Brownsville, TX 78520

Dear Mrs. Lopez:

We have received a letter addressed to you from Texas State Bank for a conditional commitment representing the balance of the purchase price for the Lasby Park Terrace Apartments and the Letter of Credit to assure the completion of the required repairs that are part of the purchase agreement.

The Department regrets to inform you, the closing cannot be delayed beyond the original closing date based upon a commitment letter contingent upon factors other than the terms of sale as required by HUD.

Because you were led to expect an extension of the closing date without the payment of extension fees, your earnest money deposit of $50,000.00 will be refunded.

If you have any questions, please contact Ruth Pompa, Chief, Sales Team, at (817) 978-5557.

Sincerely,

Alvin E. Braggs
Director
Ft. Worth Multifamily PD Center

**EXHIBIT**

**B**